UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| PAUL CARTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Cause No. 1:23-CV-364-HAB |
| | ) |
| CAREY SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Paul Carter ("Carter") was fired after repeatedly failing to follow Defendant Carey Services, Inc's ("CSI") timekeeping procedures. Believing he was fired because of his disability, Plaintiff sued under the Americans with Disabilities Act ("ADA"). Defendant moved for summary judgment (ECF No. 21), and that motion is now fully briefed. (ECF Nos. 24, 26, 30).

**I.      Factual Background**

CSI is a "community-based human services organization" focused on providing education and healthcare services for individuals with intellectual and developmental disabilities. The organization used an Employee Handbook that contained equal employment and anti-discrimination policies. The Handbook also provided that, should employes require a reasonable accommodation because of a mental or physical disability, they should contact the Director of HR to begin an interactive process to verify the disability and identify a reasonable accommodation.

Because CSI received reimbursement for services rendered, accurate time keeping was vital. Employees could not work outside normally scheduled hours without authorization, were required to validate their time report, and were advised that incorrect time reports or falsification of those reports would result in disciplinary action—including termination. The Handbook set out

a progressive discipline process, but supervisors could use their discretion to bypass steps of that process. But before terminating an employee, supervisors had to discuss discipline with the senior management of the department, the President/CEO, and the Director of HR. Carter received the Handbook, and knew where to direct questions about the policies.

Carter was hired in July 2018 as a Direct Support Professional ("DSP"). At the time of his hiring, Carter reported that he suffered from an "intellectual disability." He also reported that he took medications for a seizure condition and acid reflux. There is no record of any written request for accommodations by Carter. But, as discussed below, Carter claims that he made several oral requests for accommodations.

Carter's normal work schedule was Monday through Friday, 8:00 a.m. through 4:00 p.m. For the first two to three years of his employment, Carter recorded his time and completed reports for services provided throughout the day. But sometime between 2021 and 2022, CSI changed their policies to require employees to record their time and the beginning or end of the day. Employees were required, however, to have all tasks completed and to clock out by 4:00 p.m.

For the first three years of his employment, it seems that Carter performed his job well. Carter acknowledged in his 2021 employee evaluation that he felt "all needs associated with [his] job [were] being met."

When CSI changed their time keeping policies, Carter's performance suffered. On February 15, 2022, Carter met with supervisors to discuss excessive non-billable time from the day before. He was informed that the meeting was part of CSI's progressive discipline process and acknowledged that further discipline could result in his termination.

Eight days later, Carter was again counseled, this time for failing to clock in and out and excessive non-billable time. CSI claims that supervisors asked Carter if he needed any assistance,

and he declined. Carter, on the other hand, claims that he asked CSI to help him come up with an accommodation to "help him be able to do his job to clock in and clock out on time." Carter further claims that there was no further discussion about an accommodation. In any event, Carter signed the counseling documents, indicating that he understood what CSI was asking him to do.

At some point between those two meetings, Carter spoke with a co-worker, telling her that he was "probably going to be fired." He also stated, "If they do fire me, it's fine. I'll just draw unemployment and make more money than I do here. And I'll have better health insurance than here, too."

On March 3, 2022, Carter received a Step I disciplinary write up for his continued failure to follow his schedule and for non-billable hours. Carter acknowledged the write up, which required him to "immediately improve on decreasing nonbillable times," and clock in and out on time. CSI claims that Carter asked for no accommodations during the meeting. Carter, however, claims that he again asked for a reasonable accommodation to help him remember to clock in and out. Carter again claims that his request for an accommodation was ignored.

One month later, Carter was issued a Step II disciplinary write up for failing to clock out on two days in March 2022. Carter was again instructed that he needed to adhere to his schedule and make sure his time records were accurate. Carter acknowledged receipt of this write up. Again, the parties dispute whether Carter asked for an accommodation during this meeting.

On April 20 and 21, 2022, Carter left CSI without clocking out. A review of his time reports revealed that Carter has falsified his time reports for those days. As a result, Carter's direct supervisor, Kim Chapman ("Chapman"), recommended that Carter be fired. Chapman and CSI's head of HR, Bonnie Smith ("Smith"), met with Carter and informed him that he was being fired. Once again, the parties dispute whether Carter asked for an accommodation during this meeting.

In fact, Carter claims that Chapman told him he was being fired "because of his disabilities." The documentation related to the termination has no record of any request for accommodation, but Carter explains this is because he didn't know he could make comments on the paperwork.

In June 2022, Carter applied for disability insurance benefits through the Social Security Administration. He listed his date of disability onset as May 1, 2022. In October 2023, Carter received a fully favorable decision. The decision concluded, among other things, that Carter "would be unlikely to function effectively in employment." Carter did not disclose his SSDI application or benefits in response to written discovery.

## II.  Legal Discussion

### A.  *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a

bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

**B.**    *Discrimination Claims under the ADA*

Section 12112(a) of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a violation of § 12112(a), Carter must show (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he suffered an adverse employment action; and (4) the adverse action was caused by his disability. *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020).

The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "can be a helpful way to evaluate evidence of discriminatory intent in employment discrimination claims." *Brooks v. Avancez*, 39 F.4th 424, 433-34 (7th Cir. 2022). But Carter is not proceeding under that framework. (ECF No. 26 at 15 n.1). Instead, he proceeds under *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760 (7th Cir. 2016), which asks, when considering the evidence as a whole, "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Id.* at 765.

CSI presents several arguments in support of its claim for summary judgment. The Court will address each in turn.

C.   *Genuine Issues of Material Fact Exists as to Whether Carter is a "Qualified Individual" under the ADA*

CSI first argues that Carter is not a qualified individual under the ADA because, it claims, that Carter could not perform the essential functions of his job even with a reasonable accommodation. The Court will accept, because it is undisputed, that proper time keeping, including clocking in and out on schedule, was an essential function of the DSP position.

CSI's argument flows from two premises. First, it argues that Carter never requested an accommodation. To be sure, "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012). But despite CSI's protestations to the contrary, Carter has designated evidence that he made CSI aware of his disabilities and his need for accommodations. According to Carter, he specifically requested accommodations during meetings on February 23, March 3, April 6, and April 22, 2022. CSI disputes Carter's claims, but deciding which version of events is true is a job for a jury, not the Court on summary judgment.

CSI next argues that having someone else perform Carter's time keeping functions is not a reasonable accommodation. If that was Carter's contention, the Court would agree. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013) ("To have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation."). But Carter testified at his deposition he needed help remembering to clock in and out, not that he needed someone to do it for him. (ECF No. 26 at 11). A fine line, maybe, but the Court can find no reference in the record to Carter ever requesting that someone else perform an essential duty of the DSP position.

In short, the evidence presented by Carter shows a question of fact as to whether Carter is a qualified individual under the ADA. Although contradicted, or at least not supported, by the documents, his claims that he repeatedly requested accommodations to compensate for his short-term memory issues are enough at this stage of the litigation.

**D.**     ***CSI's* McDonnell Douglas *Arguments are Misplaced***

CSI next advances two arguments under the burden-shifting framework of *McDonnell Douglas*. It argues that Carter cannot point to any similarly situated employees that were treated more favorably, and that Carter cannot show that his firing was pretext.

But, as noted above, Carter isn't proceeding under *McDonnell Douglas*. He is proceeding under an *Ortiz* approach, and so must the Court. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020).

And no matter how the Court proceeds, Carter has provided the Court with evidence that would allow a reasonable jury to conclude that his disability was the but-for cause of his termination. He presents the most direct evidence one can have—an alleged statement by his supervisor that he was being terminated *because of his disability*. See *Dickerson v. Bd. of Tr. of the Cmty. Coll. Dist No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) ("Direct evidence requires an admission by the decision maker that his or her actions were based on the prohibited animus."). The Court understands that CSI disputes that this statement was made, but the Court cannot resolve that dispute at the summary judgment stage.

**E.**     ***Carter is not Judicially Estopped from Pursuing an ADA Claim***

Finally, CSI argues that Carter's successful pursuit of SSDI benefits, and the representations made to get those benefits, estops his ADA claim. This argument raises an apparent inconsistency between the successful SSDI claimant and a putative ADA claimant—how can one

be completely disabled, to receive social security disability benefits, yet be a "qualified individual" under the ADA?

The Supreme Court answered this question in *Cleveland v. Pol'y Mgmnt. Sys. Corp.*, 526 U.S. 795 (1999). The question posed in *Cleveland* was whether one's successful pursuit of SSDI benefits either estops him from pursuing an ADA claim or triggers a presumption that he is unable to perform the essential functions of his job. The Court unanimously concluded that it does neither of these things. As Justice Breyer explained, the SSA and the ADA do not employ the same criteria in assessing the individual's ability to work. For example, the ADA envisions that someone with a disability may work, but only with a reasonable accommodation (e.g., job restructuring, reassignment to a different position, part-time work, and so forth). The SSA, on the other hand, does not consider potential accommodations in assessing one's ability to continue working. *Id.* at 803. The ADA also calls for an individualized inquiry into a person's ability to perform the essential functions of her job, while the SSA incorporates several presumptions about the effect of various disabilities—certain listed impairments are considered disabling per se, for example, although a given person with one of those impairments might, in reality, retain the ability to work at some jobs. *Id.* at 804. Thus, a claim for disability benefits asserting that the applicant is no longer capable of gainful employment "often implies a context-related legal conclusion, namely 'I am disabled for purposes of the Social Security Act.'" *Id.* at 802. So understood, a quasi-legal assertion of this kind does not foreclose the possibility that the individual is nonetheless "qualified" to work for purposes of the ADA. Moreover, disabilities can change over time. Thus, a person might be unable to work at the time he applies for, and receives, SSDI benefits, and yet later regain the ability to work. *Id.* at 805. In sum, one might be considered unable to work for purposes of SSDI

8

benefits and yet still be able to show that she could perform the essential functions of her job for purposes of the ADA. So the application for and award of benefits does not resolve an ADA claim.

Yet as the Court later recognized, in some cases a successful claim for SSDI benefits will appear to pose a genuine conflict with an ADA claim; and in such cases, the ADA plaintiff may not ignore the seeming conflict. *Id*. at 805–06. "[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation." *Id*. at 806. As whenever a party attempts to create a genuine issue of fact by contradicting his own prior statement under oath, *see*, *e.g.*, *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995), an ADA plaintiff who has obtained SSDI benefits by making a sworn statement to the effect that he is completely disabled and thus unable to work must confront and reconcile the apparent inconsistency between that assertion and his ADA claim whose premise is that he can work. *Id*. at 806–07.

How does an ADA plaintiff reconcile the apparent inconsistency? Relevant here, the Seventh Circuit has explained that a plaintiff "might point out, for example, that because the Social Security Administration does not consider whether a claimant could perform his past work if his employer made reasonable efforts to accommodate his disability, his claim that he was unable to do the job leaves open the possibility that he might be able to meet the essential criteria of the position if he were accommodated." *Lee v. City of Salem, Ind.*, 259 F.3d 667, 675 (7th Cir. 2001).

That's precisely what Carter has argued. Parroting *Lee*'s example, Carter argues, "[i]f Defendant would have accommodated Plaintiff's disabilities . . . then he would have continued working for Defendant and would not have applied for SSDI benefits." (ECF No. 26 at 14). This is enough of an explanation under *Cleveland*.

9

This explanation is also consistent with the SSDI record. The ALJ's award of benefits repeatedly references Carter's failure to remember to clock in and out as the reason for his termination. (ECF No. 22-3 at 22, 23). And while the ALJ found "marked" limitations in understanding, remembering, and applying information, in Carter's ability to concentrate, persist, and maintain pace, and in Carter's ability to adapt or manage himself (*Id*. at 21, 22), there was also evidence that Carter had only slight impairments in these areas. (*Id*. at 23). There is nothing impossibly irreconcilable between Carter's SSDI materials and his current claim under the ADA.

**III.     Conclusion**

This opinion should not be read as an endorsement of Carter's claim. The Court finds it unlikely that CSI, a business that provides services to individuals with intellectual disabilities, would fire someone based on those same disabilities. The Court also finds it unlikely that CSI would fail to engage in an interactive process if the requested accommodation was something as simple as a reminder to clock out. But Carter has submitted evidence that both these things happened. That's enough to get him to a jury.

For these reasons, Defendant's motion for summary judgment (ECF No. 21) is DENIED.

SO ORDERED on February 21, 2025.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT JUDGE